97 F.3d 902
 72 Fair Empl.Prac.Cas. (BNA) 53
 David KELLY, Plaintiff-Appellant,
v.
MUNICIPAL COURTS OF MARION COUNTY, INDIANA, Municipal Court
Room Six (6) of Marion County, Indiana, Wendell W. Mayer, as
Administrator of Support Personnel of Municipal Court Room
Six and individually, et al., Defendants-Appellees.
 No. 95-2448.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 20, 1996.
Decided Oct. 2, 1996.
 
 Jack C. Brown, Indianapolis, IN, John O. Moss (argued), Moss & Associates, Indianapolis, IN, for Plaintiff-Appellant.
 Anthony W. Overholt (argued), Office of the Attorney General, Indianapolis, IN, for Defendants-Appellees.
 Before COFFEY, EASTERBROOK, and EVANS, Circuit Judges.
 COFFEY, Circuit Judge.
 
 
 1
 David Kelly, a black male and a Jehovah's Witness, worked as a bailiff in the courtroom of Judge Wendell Mayer. Mayer discharged Kelly, ostensibly for poor job performance as well as for inappropriate conduct, including proselytizing and reading the Bible in public areas of the court house. In response, Kelly brought suit, claiming that he was harassed and ultimately fired due to his race, religious beliefs, and refusal to contribute to and work for the Republican Party. After dismissing some of Kelly's claims as barred by the Eleventh Amendment and granting summary judgment against Kelly on most of the others, the district court conducted a jury trial on Kelly's claim that he was fired due to his political beliefs. At the end of Kelly's case-in-chief, the district court granted Mayer's motion for judgment as a matter of law. Fed.R.Civ.P. 50(a).
 
 
 2
 On appeal, Kelly challenges the dismissal on Eleventh Amendment grounds of various defendants; the grant of summary judgment on his claim that Mayer violated his rights to freedom of religion and equal protection of the law; and the grant of judgment as a matter of law on his claim that he was fired because of his political beliefs. He also raises several evidentiary issues. We affirm.I. BACKGROUND
 
 
 3
 Defendant Wendell Mayer, a lifelong Republican, was appointed as a judge of the Marion County Municipal Court effective August 1, 1989. Kelly applied for and was hired as Mayer's bailiff and commenced work on August 22, 1989. Mayer interviewed Kelly, asked him about his previous work experience, and explained the requirements of the job. Mayer inquired of Kelly as to whether Kelly was a Republican, and Kelly replied that he was. He also told Mayer that he had once studied with the Jehovah's Witnesses, whose religious doctrine prohibited members from voting or participating in the political system. However, Kelly stated that he wasn't sure about the Jehovah's Witnesses and intended on remaining a Republican at that time. Mayer told Kelly that he suggested to his employees that they contribute a part of their salary to the Republican Party. Further, Kelly testified that Mayer also told him that he "expected" his staff to work at the polls on election day and to participate in the electoral process. [Tr. II at 37]. Mayer denied these two statements, testifying that he never told Kelly that it was mandatory for Kelly to contribute to the party or to work at the polls.
 
 
 4
 At some point (the record is unclear), Kelly began studying to become a Jehovah's Witness. [K. Aff. para. 13]. Kelly kept a Bible on his desk, which was located in an area of the office that was open to the public. Kelly read the Bible during "down time" in the public reception area; on several occasions, he also read the Bible to prisoners while they were waiting in the holding cells. [Mayer Dep. 170-90]. Mayer instructed Kelly to refrain from reading the Bible or proselytizing in public areas because he believed that such activities could suggest that the court was promoting religion and would thus be a violation of the Judicial Code of Ethics, to which Mayer and his staff were bound. Mayer did not prohibit his other employees from reading materials such as newspapers, paperback novels, and magazines. [Mayer Dep. 179-80].
 
 
 5
 In January 1990, Kelly informed Chief Bailiff David Anderson that he was no longer going to contribute 2 percent of his salary to the Republican Party because to do so would violate the religious dictates of the Jehovah's Witnesses. Anderson reported directly to Mayer. [K. Aff. para. 12]. In February 1990, Kelly ceased contributing to the Republican Party. In late April or early May 1990, Kelly told Anderson that, in keeping with his religious beliefs, he did not intend to work at the polls for the Republican Party during the May primary. [Id. at para. 13].
 
 
 6
 Kelly's decision not to contribute to the Republican Party and not to work at the polls was common knowledge among Mayer's staff. [Tr. I at 68]. However, neither Kelly, Anderson, nor Jane Sears, Mayer's court reporter, ever told Judge Mayer of Kelly's decision. Anderson testified that if Jane Sears knew that Kelly was not contributing to the Republican Party or working at the polls, then Mayer knew it as well. [Tr. I at 70, 74].
 
 
 7
 On June 7, 1990, Kelly received a written reprimand from Mayer listing the following problems: (1) "Witnessing" (promoting his religious beliefs to the public), (2) "Reading Materials" (reading the Bible in public areas), (3) "Working Hours" (arriving late), (4) "Lunch Hour" (failing to coordinate times with other members of staff), (5) "Phones" (failing to answer the phone), and (6) "Absence during working hours" (failing to inform other members of staff). On September 7, 1990, Mayer terminated Kelly's employment because he did not consider Kelly had improved sufficiently in these problem areas.
 
 
 8
 In July 1990, according to Kelly, prior to his discharge, certain members of Mayer's staff harassed Kelly by teasing him about his sex life. They asked how he had time for sex when he went to church all the time. Typically, on Mondays when Kelly came to work, they would ask what he had done over the weekend and whether or not he had had any sexual encounters. Kelly reported this behavior to Mayer and asked Mayer to have them stop harassing him, but Mayer took no action. [K. Aff. para. 15].
 
 
 9
 Judge Evan Goodman was the Presiding Judge of the Municipal Court of Marion County during the time of Kelly's employment with Mayer. According to the Personnel Manual for the Municipal Court of Marion County, the presiding judge had to give his consent whenever an employee was disciplined or terminated. Goodman was never advised that Mayer had terminated Kelly's employment.
 
 
 10
 Kelly filed this lawsuit on October 24, 1991. In his Second Amended Complaint, Kelly named as defendants the Municipal Courts of Marion County, Wendell Mayer, both individually and as administrator of support personnel of Municipal Court Room Six, and Evan Goodman, both individually and as chief administrator of the Municipal Courts of Marion County.[1] In Count I of the four-count complaint, Kelly sued the defendants[2] under 42 U.S.C. § 1983 for allegedly violating his rights to freedom of religion, liberty, political association, equal protection of the law, and due process of law. Under Count II, Kelly sued the defendants under § 1983 for allegedly violating his right not to be terminated from his employment without due process of law. In Count III, Kelly sued the defendants under 42 U.S.C. § 2000e for terminating him allegedly because of his religious and political beliefs, affiliations, and associations. In Count IV, Kelly sued the defendants for allegedly discriminating against him in violation of 42 U.S.C. § 1981 by granting white employees permission to read literature of their choice at work while denying such permission to Kelly.
 
 
 11
 The district court dismissed Kelly's claims under Counts I and II insofar as those claims related to Mayer and Goodman in their official capacities. The court determined that the Eleventh Amendment barred these claims. The court also dismissed the claims under Counts I and II as they related to Goodman in his individual capacity because of the absence of a causal link between Goodman and the alleged deprivations. Furthermore, the court dismissed Counts III and IV in their entirety. The claims in Count III were held to be barred by the statute of limitations, and the claims in Count IV were held outside of the scope of § 1981 pursuant to Patterson v. McLean Credit Union, 491 U.S. 164, 179-80, 109 S.Ct. 2363, 2374, 105 L.Ed.2d 132 (1989), and Luddington v. Indiana Bell Telephone Co., 966 F.2d 225 (7th Cir.1992).
 
 
 12
 In an entry dated May 10, 1994, the court granted Mayer's motion for summary judgment in part on the claims remaining against him in Counts I and II. The court granted summary judgment to Mayer on Kelly's religious discrimination claim, concluding that preventing Kelly from reading the Bible or evangelizing during working hours while in the court's public areas did not violate either the Free Exercise Clause or the Establishment Clause of the First Amendment. Next, the court determined that Mayer was entitled to summary judgment on Kelly's "liberty" claim. The court construed this as a claim that Kelly had a substantive due process interest in reading the Bible and evangelizing while in court. The court determined that Mayer's restrictions during working hours were reasonable in light of the purpose that the court serves. Third, the court granted summary judgment to Mayer on Kelly's claim that Mayer violated Kelly's right to equal protection. According to the court, Kelly's equal protection claim for racial discrimination failed for lack of evidence in support of the conclusion that he was terminated due to his race; his religious harassment claim failed because, in the court's view, the "harassment" of which Kelly complained was not sufficiently severe to create a "hostile work environment." Finally, the court denied summary judgment to Mayer on Kelly's claim that he was terminated in violation of his right to freedom of political association.
 
 
 13
 The district court conducted a jury trial on Kelly's claim against Mayer in his individual capacity that Mayer violated Kelly's right to freedom of political association by terminating Kelly for refusing to contribute to the Republican Party and for refusing to work at the polls on election day. At the close of Kelly's case-in-chief, the court granted Mayer's motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50(a). The court reasoned that Kelly had failed to present sufficient evidence from which a reasonable person could conclude that Kelly's decision to withdraw from politics was a substantial or motivating factor in Mayer's decision to terminate Kelly. According to the court, there was insufficient evidence to conclude (1) that Kelly had proven that Mayer knew about Kelly's decision to withdraw from politics, or (2) that Mayer conditioned Kelly's employment on his contributing to the Republican Party or participating in politics.
 
 
 14
 The district court entered judgment dismissing all of Kelly's claims on May 16, 1995. Kelly filed a timely notice of appeal on June 14, 1995.
 
 II. ISSUES
 
 15
 Kelly raises a number of issues in a variety of procedural postures. First, he claims that the district court erred when it dismissed the Municipal Court of Marion County and Mayer and Goodman in their official capacities. He maintains that, contrary to the holding of the district court, none of these defendants constituted an arm of the State of Indiana for purposes of the Eleventh Amendment. Second, Kelly maintains that the district court erred in dismissing defendant Judge Goodman, whom Kelly sued in his individual capacity, on the ground that Goodman had no personal part in Kelly's termination. According to Kelly, Goodman allowed Kelly to be fired without Goodman's consent as required by the Personnel Manual of the Municipal Court of Marion County. Third, Kelly contends that the district court erred in granting summary judgment in favor of Mayer in his individual capacity on Kelly's claim that Mayer, by tolerating his staff's harassment of Kelly due to Kelly's religious beliefs, violated his rights to religious freedom, due process, and equal protection. Further, Kelly alleges that his discharge violated these same rights. Fourth, Kelly maintains that the district court erred in granting Mayer's motion for judgment as a matter of law at the close of Kelly's casein-chief. Finally, Kelly contends that the district court erred in excluding several exhibits and in refusing to permit Kelly's mother to testify.
 
 III. DISCUSSION
 A. Eleventh Amendment
 
 16
 Kelly claims that the district court erroneously dismissed the Municipal Court of Marion County and Mayer and Goodman in their official capacities. The district court dismissed these defendants on the ground that they were entitled to immunity from suit under the Eleventh Amendment to the United States Constitution.[3] The district court reasoned that, insofar as Kelly was suing Mayer and Goodman in their official capacities, he was suing the Municipal Court of Marion County, which is a state court, and hence an arm of the State of Indiana.
 
 
 17
 On appeal, Kelly challenges the district court's conclusion that the Municipal Court of Marion County is a state court. Kelly maintains that a municipal court is a city court. In support of this position, he traces the history of the municipal courts. He notes that under a 1905 Indiana law, certain cities were given the power to create their own courts. An Act Concerning Municipal Corporations, ch. 129, 1905 Ind.Acts 219. He contends that these courts were later succeeded by the municipal courts. Act of March 12, 1925, ch. 194, 1925 Ind.Acts 457. As a result, according to Kelly, a municipal court is a city court and not a state court.
 
 
 18
 We must consult Indiana law to determine whether a municipal court is part of the judicial branch of the State of Indiana. Scott v. O'Grady, 975 F.2d 366, 370 (7th Cir.1992). Several aspects of Indiana law suggest that a municipal court is a state court and not a city court. In a number of respects, Indiana law distinguishes between a municipal court and a city court. For example, the Indiana legislature enacted a statute creating a municipal court in any county containing a city of the first class. Ind.Code § 33-6-1-1. On the other hand, city courts are created by the various legislative bodies of the respective city governments. Ind.Code § 33-10.1-1-3. In addition, the jurisdiction of a municipal court differs from that of a city court. A municipal court generally has broader jurisdiction than a city court. Compare Ind.Code § 33-6-1-2 with Ind.Code § 33-10.1-2-2, § 33-10.1-2-3.1, and § 33-10.1-2-4. Another difference is that a municipal court is a court of record, Ind.Code § 33-6-1-1, meaning that its proceedings are permanently recorded and it has the power to fine or imprison for contempt or for nonpayment of a fine imposed, see Black's Law Dictionary 326 (5th ed. 1979). In contrast, a city court is not a court of record under Indiana law. Ind.Code § 33-10.1-5-7. Finally, the appeal procedures for a municipal court and those for a city court differ. An appeal of a judgment from a municipal court may be taken to the state court of appeals. Ind.Code § 33-6-1-8. "Such an appeal shall be governed in all respects by the law relating to appeals to the supreme court and courts of appeals from the circuit courts so far as same are applicable." Id. In contrast, an appeal from a city court is taken to the circuit or superior court of the county and tried de novo. Ind.Code § 33-10.1-5-9(a). Thus, a municipal court is almost akin to a state circuit court, which we have already determined to be a component of the judicial branch of state government. Woods v. City of Michigan City, 940 F.2d 275, 279 (7th Cir.1991). This conclusion is bolstered when we consider that the $85,000.00 base salary of a municipal court judge is paid by the state, see Ind.Code § 33-13-12-7; § 36-2-5-14; § 36-3-6-3(c), whereas the salary of a city court judge is paid by the city, see Ind.Code § 33-10.1-4-2(e). In light of the above, we hold that the Municipal Court of Marion County is a unit of the judicial branch of the State of Indiana[4] and that a municipal court judge is a state officer entitled to immunity under the Eleventh Amendment. Accordingly, we conclude that the district court did not err in dismissing the Municipal Court of Marion County and Judges Mayer and Goodman in their official capacities.[5]
 
 B. Goodman in His Individual Capacity
 
 19
 Kelly argues that the district court erred in dismissing Counts I and II as they pertained to Judge Goodman in his individual capacity. Counts I and II alleged violations of Kelly's rights to due process, equal protection, and freedom of religion. The district judge determined that these two counts, each of which asserts a separate cause of action under 42 U.S.C. § 1983, had to be dismissed because liability under § 1983 requires a causal connection between the misconduct complained of and the official sued, and, according to the trial judge, any such link as to Goodman was entirely absent.
 
 
 20
 On appeal, Kelly disregarded and failed to address the district court's reasons for dismissing Counts I and II as they related to Goodman in his individual capacity. Rather, he simply states that Goodman denied him his right to continued employment "by allowing [Kelly] to be fired without [Goodman's] advice and consent as Presiding Judge, which is required" by the Personnel Manual of the Municipal Courts of Marion County.
 
 
 21
 Individual liability under 42 U.S.C. § 1983 can only be based on a finding that the defendant caused the deprivation at issue. Monell v. Department of Social Servs., 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-38, 56 L.Ed.2d 611 (1978). A defendant will not be liable for a constitutional violation under § 1983 if the defendant merely exercised supervisory authority over those who violated the plaintiff's rights and otherwise failed to participate in any violation of the plaintiff's rights. In order for a defendant to be held liable under § 1983, the plaintiff must establish that the defendant was personally involved or acquiesced in the alleged constitutional violation. Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir.1995).
 
 
 22
 In reviewing the trial court's dismissal of Counts I and II for failure to state a claim upon which relief may be granted, Fed.R.Civ.P. 12(b)(6), we must accept as true the allegations of Kelly's complaint insofar as they relate to Goodman's involvement in his firing. McTigue v. City of Chicago, 60 F.3d 381, 382 (7th Cir.1995). Kelly's Second Amended Complaint is not entirely clear as to the extent he alleges that Goodman was involved in his termination. Nevertheless, in light of the personal-involvement requirement for liability under § 1983, Kelly faces a Catch-22. If we construe the Second Amended Complaint as alleging that Goodman did not personally participate in his firing (thereby alleging a violation of the "consent" provision of the Personnel Manual), then liability will not attach because of the lack of personal involvement required by § 1983. On the other hand, if we construe the complaint as alleging that Goodman did personally participate in Kelly's firing, then Goodman has satisfied the consent provision of the Manual. Under this construction of the complaint, Kelly's theory of liability against Goodman falls short since Kelly's claim against Goodman is based upon Goodman's alleged failure to give consent to Kelly's discharge. Accordingly, we conclude that the district court did not err in dismissing Counts I and II as they pertained to Judge Goodman in his individual capacity.
 
 
 23
 C. Religious Discrimination and Equal Protection
 
 
 24
 Kelly next contends that the district court committed error in granting summary judgment to Mayer on Kelly's claims that Mayer, by tolerating his staff's harassment of Kelly due to Kelly's religious beliefs and also the firing of Kelly, violated Kelly's rights to religious freedom and equal protection of the law.
 
 
 25
 Kelly claims that Mayer violated his right to religious freedom under the Free Exercise Clause of the First Amendment by preventing him from reading the Bible during working hours in a public area of the court, while other members of Mayer's staff were permitted to read literature of their choice.[6] The district court concluded that the undisputed evidence demonstrated that Mayer only prohibited Kelly from reading the Bible while in the court's public areas. The court reasoned that this restriction did not violate Kelly's rights under the Free Exercise Clause.
 
 
 26
 Before delving into a detailed analysis of Kelly's religious discrimination claim, we pause to consider whether we need address the merits of this issue at all. At oral argument, we tried to ascertain what relief Kelly sought on the religious discrimination claim. We pointed at that, according to Kelly's submissions to us, he was discharged on the basis of his political beliefs, not because he read the Bible while on the job, and thus reinstatement was not available. Kelly's attorney responded by stating that Kelly "may have" disobeyed Mayer's order and continued to read the Bible in public areas of the court during working hours. Although Kelly's attorney waffled on whether Kelly complied with Mayer's order, the key question on appeal from the grant of summary judgment is whether Kelly presented any evidence from which a jury could reasonably conclude that he disobeyed Mayer's order and was fired on that account. We examined the record for any evidence that Kelly disobeyed Mayer's order, and we found none. Accordingly, reinstatement is not an option. Moreover, although we inquired of Kelly's attorney on two separate occasions during oral argument as to what relief Kelly sought, he mentioned only reinstatement; he failed to mention damages, not even nominal damages. We thus hold that Kelly's claim for reinstatement is moot and a claim for damages has not been properly preserved.[7] Because no relief is available for Kelly's religious discrimination claim, we need not address the merits of that claim.
 
 
 27
 Kelly also asserts that he endured religious harassment by his coworkers, specifically, that his coworkers harassed him about his religious practice of abstaining from sexual activities outside of marriage. He further maintains that Mayer failed to do anything to stop the harassment when Kelly informed him of it. However, Kelly fails to set forth clearly the legal framework upon which he bases his claim. Although we assume this claim is based on 42 U.S.C. § 1983, Kelly failed to mention § 1983 and its ramifications in relation to this claim. For example, under § 1983, an employer cannot be held responsible on the basis of respondeat superior, yet Kelly failed to delineate under what theory of law he believes Mayer can be held responsible for his staff's alleged harassment. We might speculate as to a possible explanation, but under our adversary system, it is Kelly's responsibility to make his position clear. Moreover, as for the substantive constitutional right at issue here, the district court believed that the religious harassment claim was based on an equal protection theory and analyzed the claim at length on that basis. On appeal, Kelly asserts in cursory fashion that the alleged harassment constituted a violation of his equal protection rights; likewise, he makes a general reference to the First Amendment without any attempt to provide the court with citation to relevant authority. Due to Kelly's failure to advance a coherent legal framework for analyzing his religious harassment claim, he has waived the issue on appeal. United States v. South, 28 F.3d 619, 629 (7th Cir.1994) (nonchalant treatment of issue results in waiver); United States v. Eddy, 8 F.3d 577, 583 (7th Cir.1993) (inadequately developed arguments are waived).[8]
 
 D. Political Beliefs
 
 28
 Kelly argues that the district court erred in granting Mayer's motion for judgment as a matter of law at the close of Kelly's case-in-chief. A trial was held on Kelly's claim that he was fired, in violation of his First Amendment right to freedom of political association, more specifically for not contributing to the Republican Party and not working at the polls on election day. The court granted Mayer's motion for judgment as a matter of law because, according to the court, Kelly failed to present evidence sufficient to establish that (1) Mayer knew of Kelly's decision to withdraw from politics, and (2) Mayer required his employees to contribute and to work at the polls.
 
 
 29
 We review the trial court's grant of judgment as a matter of law de novo. Jackson v. Bunge Corp., 40 F.3d 239, 246 (7th Cir.1994). Judgment as a matter of law is proper if "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the nonmoving] party." Fed.R.Civ. P. 50(a)(1). We view the evidence adduced at trial in the light most favorable to the nonmoving party. Thomas v. Stalter, 20 F.3d 298, 301 (7th Cir.1994).
 
 
 30
 In a § 1983 claim based on the First Amendment, the plaintiff must establish (1) that his conduct was constitutionally protected and (2) that his conduct was a "substantial factor" or "motivating factor" in the challenged action by the defendant. Johnson v. University of Wisconsin-Eau Claire, 70 F.3d 469, 482 (7th Cir.1995). In the present case, there is no dispute that Kelly's decision to withdraw from and to refuse to participate in political activity is constitutionally protected. The parties disagree, however, over whether that decision was a "substantial" or "motivating" factor in Mayer's decision to fire Kelly.
 
 
 31
 Mayer argues that there was no evidence that he knew of Kelly's decision to withdraw from political activity. Mayer notes that Kelly himself testified that he did not inform Mayer of his decision. Mayer also points to the testimony of his other staff members; none testified that he or she told Mayer about Kelly's decision. According to Mayer, absent evidence that he knew of Kelly's decision to withdraw from politics, no jury could reasonably conclude that Mayer's decision to fire Kelly was motivated by Kelly's decision to refuse to participate in political activity.
 
 
 32
 Kelly argues that, drawing all reasonable inferences in his favor, a reasonable person certainly could conclude that Mayer knew of his decision to withdraw from politics. Kelly points to the fact that he informed Anderson in late April or early May of 1990 of his decision to no longer work at the polls. He also maintains that Anderson informed Mayer about where Mayer's staff members would be working at the polls during the May 1990 primary election. Kelly infers from this that "Anderson told Mayer that Kelly would not be working at the polls" during that election. (Appellant's Br. 28).
 
 
 33
 We have been unable to find any evidence in the record, nor has Kelly pointed to any page citation in the record, that anyone told Mayer of Kelly's decision to withdraw from any and all political activity. The testimony does reflect that it may have been common knowledge among Mayer's staff that Kelly had decided to cease contributing and to not work at the polls on election day. However, the record is barren of any evidence that any staff member actually told Mayer of Kelly's decision. Anderson did indeed testify that, in his opinion, if Jane Sears, Mayer's court reporter, knew of Kelly's decision, then Mayer must have known as well. Yet the evidence before us falls far short of establishing that Sears actually told Mayer. The portions of her testimony included in Kelly's appendix on appeal fail to contain any statement by Sears that she informed Mayer of Kelly's decision. Thus, Kelly's assertion, based on Anderson's testimony, that Mayer must have known because Sears knew is a self serving declaration based on nothing more than speculation.
 
 
 34
 Kelly argues that, although perhaps no one told Mayer directly of Kelly's decision to withdraw from politics, Mayer was informed indirectly. Kelly contends that Anderson conveyed to Mayer by implication the fact that Kelly decided not to work at the polls. Kelly relies on Anderson's testimony on direct examination:
 
 
 35
 Q. And do you recall whether or not Mayer asked his employees where they would be working on election day?
 
 
 36
 A. I remember telling him; I don't remember him asking. He probably did. I don't recall that part about it, but I remember telling him. I can't remember if it was his question or just me blurting it out. I don't know.
 
 
 37
 Q. But in any event, the information was conveyed by one means or another; is that correct?
 
 
 38
 A. Yes. He knew I was working at the polls.
 
 
 39
 Kelly interprets Anderson as saying that he told Mayer where all of Mayer's employees would be working on election day. (Appellant's Br. 28). Under this interpretation, Anderson would necessarily have omitted any mention of Kelly working at the polls, so Mayer would have been informed indirectly that Kelly would not be working at the polls. In our view, speculation of this nature is at best an unreasonable interpretation because, in response to the follow-up question, Anderson clarified that he had told Mayer only where he, Anderson, would be working on election day, not where each and every member of Mayer's staff would be working. Kelly has thus failed to identify or cite any evidence in the record that Mayer was informed indirectly or by implication that Kelly had decided not to work at the polls on election day and not to contribute to the Republican Party. Without evidence, either direct or indirect, that Mayer was aware of Kelly's decision to withdraw from politics, Kelly has failed to demonstrate that his political views were a "substantial" or "motivating" factor in Mayer's decision to fire Kelly. Accordingly, the district court did not err in granting judgment as a matter of law to Mayer. Johnson, 70 F.3d at 482.
 
 
 40
 Mayer also argues that, aside from whether or not Mayer knew of Kelly's withdrawal from politics, there was insufficient evidence for a jury to conclude that active involvement in politics was a condition of employment for Mayer's employees. Mayer concedes that he viewed political participation as very important and highly desirable; however, he denies that he ever conditioned an employee's job on being involved in politics. Kelly responds by noting that he testified that Mayer told him that he "expected his staff to work at the polls. And that they participate in the electoral process." Kelly argues that, viewing the evidence in the light most favorable to him, his testimony should be interpreted to mean that Mayer required his employees to work at the polls and to participate in the electoral process.
 
 
 41
 We disagree and do not believe that Kelly's interpretation is a reasonable one. First, after testifying that Mayer told him he "expected" his employees to work at the polls and to participate in the electoral process, Kelly was asked what he understood Mayer to mean by that statement. Kelly responded: "I understood that that's just what he meant: He expected us to do that." Tr. II at 39. When given an opportunity to equate "expected" with "required," Kelly declined and instead affirmed that Mayer simply meant "expected." Thus, Kelly's own testimony does not support Kelly's current interpretation of Mayer's statement. Second, the sequence of events leading to Kelly's termination supports the conclusion that Kelly's withdrawal from politics was not a substantial or motivating factor in his termination. Kelly informed Anderson in early May 1990 that he would not be working at the polls. Kelly was not terminated until September 1990. Assuming for the sake of argument that Mayer was aware of Kelly's decision, the four-month delay between Kelly's decision not to work at the polls and his termination seems to undercut any inference that Kelly's withdrawal from politics was a substantial or motivating factor in Mayer's decision to fire Kelly. This situation is analogous to that in Benson v. Cady, 761 F.2d 335, 342 (7th Cir.1985), where there was a five-month delay between a prisoner's filing of a lawsuit and the prison authorities' transfer of the prisoner. We held that, due to the lengthy delay, there was insufficient evidence to support an inference that the transfer was in retaliation for the filing of the lawsuit. We agree with the district court that there was insufficient evidence from which a jury could reasonably conclude that Kelly's withdrawal from politics was a substantial or motivating factor in Kelly's termination. We conclude that the district court properly granted judgment as a matter of law in favor of Mayer on Kelly's claim that Mayer terminated him in violation of his right to freedom of political association.
 
 E. Evidentiary Rulings
 
 42
 Kelly argues that the district court erred in several of its evidentiary rulings during the trial. We review the decisions of the district court regarding the admission or exclusion of evidence under the abuse of discretion standard. Jackson v. Bunge Corp., 40 F.3d 239, 246 (7th Cir.1994). Kelly sought to introduce the Personnel Manual for the Municipal Court of Marion County. The district court sustained an objection to its admissibility for lack of relevance. Later, upon Kelly's request for reconsideration, the district court ruled that Kelly had failed to lay a sufficient foundation for the admissibility of the Manual because no witness had testified that the Manual applied to bailiffs. On appeal, Kelly argues that the Manual was relevant because it provided that no employee could be discharged without the consent of the presiding judge.
 
 
 43
 Kelly has failed to demonstrate the relevance of the Manual. The only claim at issue in the trial was whether Mayer violated Kelly's right to freedom of political association by firing him for not participating in the political process. Whether the presiding judge needed to consent to Kelly's firing has no bearing on that issue. In addition, Kelly failed to address the district court's revised ruling that Kelly failed to lay a proper foundation for the admissibility of the Manual. Accordingly, the district court did not abuse its discretion in refusing to admit the Personnel Manual.
 
 
 44
 Next, Kelly maintains that the district court erred in sustaining an objection to the introduction of a memorandum memorializing a conversation that Kelly had with Judge Goodman after the termination of Kelly's employment. Kelly claims that the memorandum contained a statement by Goodman as to why Kelly had been discharged. This statement, however, was hearsay. Kelly argues that the memorandum should have been admitted under the catch-all exception to the hearsay rule. Fed.R.Evid. 803(24). However, at trial Kelly maintained that the memorandum was admissible under the present sense impression exception to the hearsay rule. Fed.R.Evid. 803(1). The district court rejected this contention. We cannot say that, under either theory, the district court's exclusion of the memorandum amounted to an abuse of discretion.
 
 
 45
 Kelly also argues that the district court erred in sustaining Mayer's objections to questions regarding the amount of money that Mayer contributed to the Republican Party. However, Kelly fails to explain how the exclusion of this testimony prejudiced him. By the time Kelly's attorney asked Mayer how much money he contributed to the Republican Party, Mayer had previously testified that he was a long-time, ardent Republican and had contributed money to the party. The precise amount of money that Mayer contributed would have added little if anything to the jury's understanding of Mayer's political views. Kelly suffered no prejudice from the exclusion of this testimony.
 
 
 46
 Next, Kelly contends that the trial judge erred in excluding Plaintiff's Trial Exhibit 2, Plaintiff's Trial Exhibit 4, and testimony from Kelly's mother. Because Kelly fails to state why in his opinion the district court excluded these exhibits and testimony, we are unable to conclude that the district court abused its discretion.
 
 
 47
 Finally, Kelly maintains that the district court erred in excluding Plaintiff's Trial Exhibit 8, which was a written determination by the Indiana Division of Employment and Training Services that Kelly was not terminated for just cause. The district court concluded that the determination was not relevant and failed to satisfy the requirements of collateral estoppel. We agree. The issue in the proceeding before the Indiana Department of Employment and Training Services was whether, under Indiana law, Kelly had been fired for "just cause." This question differed from the federal constitutional issues presented in this case. Accordingly, the district court did not abuse its discretion in excluding Plaintiff's Trial Exhibit 8.
 
 IV. CONCLUSION
 
 48
 The judgment of the district court is AFFIRMED.
 
 
 
 [1]
 Kelly also named "Municipal Court Room Six" as a separate defendant. Because Municipal Court Room Six is a subunit of the Municipal Court of Marion County, which Kelly named as a defendant, we will not refer to "Municipal Court Room Six" as a separate defendant
 
 
 [2]
 Kelly refers only to Mayer and Goodman in the separate counts. We construe these counts as referring to Mayer and Goodman in their individual and official capacities
 
 
 [3]
 The Eleventh Amendment provides:
 The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state.
 The United States Supreme Court has interpreted the Eleventh Amendment to bar suits against a state by its own citizens. Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).
 
 
 [4]
 The Municipal Court of Marion County, established under Ind.Code § 33-6-1, was abolished effective December 31, 1995, and all cases pending before it were transferred to the Marion superior court. P.L. 16-1995, Secs. 15 & 22
 
 
 [5]
 Kelly notes that, in his First Amended Complaint, he sought equitable and injunctive relief, and points out that the Eleventh Amendment does not prohibit such relief. However, Kelly fails to actually argue that the district court erred by dismissing his claims for equitable and injunctive relief. In addition, we note that, based on the Eleventh Amendment, the district court dismissed portions of Kelly's Second Amended Complaint, not his First Amended Complaint. Because of the cursory treatment accorded this issue in Kelly's brief, see Appellant's Br. 9, we conclude that Kelly has waived any argument concerning the dismissal of his claims for equitable and injunctive relief. See United States v. South, 28 F.3d 619, 629 (7th Cir.1994) ("South's nonchalant treatment of this issue leads us to conclude that he considers the inquiry of little significance.... Consequently, South's challenge to the sufficiency of the evidence in support of his conviction for attempt is waived.")
 
 
 [6]
 The district court noted that Kelly's complaint offered little guidance as to the precise legal theory on which he based his religious discrimination claim. The court analyzed Kelly's claim under both the Free Exercise Clause and the Establishment Clause. Entry of May 10, 1994 ("Entry") at 5. On appeal, Kelly again offers no clear guidance as to the basis of his religious discrimination claim. Because he does not discuss the law supporting a claim based on the Establishment Clause, e.g., Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), and because he refers only to the free exercise of his religion, see Appellant's Br. 17, we construe his brief as raising only the latter issue. In addition, we note that Kelly makes no claim based upon the Religious Freedom Restoration Act of 1993, Pub.L. No. 103-141, 107 Stat. 1488 (codified at 42 U.S.C. §§ 2000bb et seq.)
 
 
 [7]
 This reasoning also applies to Kelly's claim that he was denied equal protection of the law because Mayer banned him from reading the Bible in public areas of the court while his white, non-Jehovah's Witness coworkers were not similarly enjoined
 
 
 [8]
 In its entry explaining its grant of summary judgment, the trial judge construed Kelly's complaint as alleging a due process interest in being able to read his Bible and evangelize while working in court. The district court thoroughly analyzed the issue as if it had been properly raised. Entry at 12-16. On appeal, Kelly asserts that the district court erred, insisting that Mayer violated his right to read what he liked. He terms this a violation of his "liberty interest" and, as such, a violation of his due process rights. (Appellant's Br. 14). We agree with the district court that Kelly's claim is unclear in this regard. Unlike the district court, we will not spare him from the requirement of offering a coherent argument on the issue. Because Kelly fails to explain how his "liberty interest/due process" claim differs from his religious discrimination claim, we deem the former waived, at least to the extent it differs from the latter. Gagan v. American Cablevision, Inc., 77 F.3d 951, 965 (7th Cir.1996)